IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RENOTA FOSTER,                )
                             )
            Plaintiff,        )
                             )
    v.                        )        No.  09 C 7041
                             )
NORTHWESTERN MEDICAL FACULTY  )
FOUNDATION,                   )
                             )
            Defendant.        )

MEMORANDUM OPINION AND ORDER

Renota Foster ("Foster") has sued her former employer,
Northwestern Medical Faculty Foundation ("Northwestern"),
asserting charges of discrimination and retaliation in violation
of the American with Disabilities Act of 1990 ("ADA," 42 U.S.C.
§§12101 to 12117) and interference and retaliation in violation
of the Family and Medical Leave Act ("FMLA," 29 U.S.C. §§2601 to
2654).  Northwestern has moved for summary judgment under Fed. R.
Civ. P. ("Rule") 56.  For the reasons stated here, its Rule 56
motion is granted in part and denied in part.

**Summary Judgment Standard**

Every Rule 56 movant bears the burden of establishing[1] the
absence of any genuine issue of material fact (Celotex Corp. v.
Catrett, 477 U.S. 317, 322-23 (1986)).  For that purpose courts

---

[1] At the summary judgment stage, of course, Foster need not
"establish" or "show" or "prove" anything, but must merely
demonstrate that a genuine issue of material fact exists. This
opinion employs those terms only because the cited cases use that
terminology, but it imposes on Foster the lesser burden described
earlier in this footnote.

consider the evidentiary record in the light most favorable to
nonmovants and draw all reasonable inferences in their favor
(Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir.
2002)).  But a nonmovant must produce more than "a mere scintilla
of evidence" to support the position that a genuine issue of
material fact exists (Wheeler v. Lawson, 539 F.3d 629, 634 (7th
Cir. 2008)) and "must come forward with specific facts
demonstrating that there is a genuine issue for trial" (id.).

Ultimately summary judgment is warranted only if a
reasonable jury could not return a verdict for the nonmovant
(Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).
What follows is a summary of the relevant facts,[2] viewed of
course in the light most favorable to nonmovant Foster.  In light
of that requirement, some of the matters sought to be emphasized
by Northwestern's counsel that are at odds with Foster's view
have been omitted.

## Factual Background

Northwestern is a large not-for-profit multi-speciality
medical practice (N. St. ¶¶3-4).  Northwestern's practice

---

[2] LR 56.1 requires parties to submit evidentiary statements
and responses to such statements to highlight which facts are
disputed and which facts are agreed upon.  This opinion cites to
Northwestern's LR 56.1 statement as "N. St. ¶ --," to Foster's LR
56.1 statement as "F. St. ¶ --" and to the parties' responses as
"N. Resp. ¶ --" and "F. Resp. ¶ --."  Where a party's response
does not provide a different version of the facts than the
original statement, this opinion cites only that original
statement.

includes a Hematology/Oncology division within its Department of
Medicine (id. ¶5). Basilia Walton ("Walton") has been the
billing supervisor in the Hematology/Oncology division since 2003
(id.). Foster, after working for Northwestern in a different,
temporary capacity for a short time, was transferred in January
2004 to a temporary position as a billing coordinator in the
Hematology/Oncology division--a position that ultimately became
permanent (id. ¶¶12-13).

Foster began suffering from panic attacks in 2005 (N. St.
¶14). Since that time she has suffered from a large number of
such attacks, including multiple attacks in a single day (F.
Resp. ¶15). When the attacks occurred at work, Foster would sit
at her desk until they passed (N. St. ¶16). In addition to the
panic attacks, Foster suffered from agoraphobia from mid-May 2007
to July 2007 (id. ¶14).

As for Foster's FMLA claim, Northwestern maintains a policy
governing leave under that statute (N. St. ¶7). Manager of
Employee Engagement Denise DeHesus ("DeHesus") administers that
policy (id. ¶9).

In January 2006 Foster first used her FMLA leave when she
took three weeks' leave to care for her mother (N. St. ¶18). In
August 2006 Walton gave Foster her annual evaluation, which noted
that Foster had received an oral warning about her attendance,
drug processing and other issues (F. St. ¶85). But that same

3

evaluation by Walton characterized Foster's overall job performance as "excellent" (id. ¶86).

During November 2006 Foster came to believe that Walton was being "tough" on her (N. St. ¶28). On November 13 Walton asked Foster what was wrong with her and what medication she was taking (F. St. ¶108). After Foster refused to answer Walton's questions, Walton said she would find out what Foster refused to disclose (id.). About a week later Walton told Foster that she knew about Foster's anxiety issues and relevant medication (id.). Thereafter Walton told many of Foster's co-workers about Foster's condition and talked about firing her (id. ¶108).

On November 27 Northwestern approved Foster's application for a week of FMLA leave to address her own medical issues (N. St. ¶19). Walton sent DeHesus an email the next day, charging that Foster was sleeping at her desk and that such activity was a possible predicate for terminating Foster (F. St. ¶90). Walton then sent DeHesus a draft Corrective Action Report referring to Foster's FMLA leave (id.), but DeHesus instructed Walton to remove that reference to FMLA leave from the report (id.).

On December 5, 2006 Northwestern approved Foster's application for intermittent FMLA leave to be taken between November 13, 2006 and November 13, 2007 (N. St. ¶20). Foster implemented that approval by using FMLA leave from November 13, 2006 until mid-May 2007 (id. ¶21).

Meanwhile, on December 15, 2006 Walton criticized Foster for making personal phone calls at work, and Foster in turn emailed DeHesus asking to speak with her about the issue (N. St. ¶¶29-30). When Foster met with DeHesus later in December, Foster complained about the way Walton had been treating her (F. Mem. Ex. 1 156:10-159:7).[3] DeHesus responded by encouraging Foster to work with Walton to resolve the issues (N. St. ¶34). DeHesus then spoke to Walton about Foster, counseling Walton on improving her performance (id. ¶35).

In January 2007[4] Walton placed Foster on a Performance Improvement Plan for issues that included making too many personal phone calls, failing to answer emails in a timely fashion and improperly pricing drugs (N. St. ¶¶23; 25). Also in January, Walton began keeping a journal of Foster's work behavior, something she did not remember doing as to any other employee (F. Mem. Ex. 4 113:22-114:9; Ex. 7). In March Walton sent another email to DeHesus listing some of Foster's asserted recent infractions and asking whether she could terminate Foster (F. St. ¶90).

Foster spoke with DeHesus again in March or April to discuss

---

[3] This opinion cites Northwestern's original supporting memorandum as "N. Mem.," Foster's responsive memorandum as "F. Mem." and Northwestern's reply memorandum as "N. R. Mem."

[4] All of this opinion's later references to dates without designating the year involved relate to occurrences later in 2007.

her issues with Walton and to ask for a change in Walton's behavior or a transfer (N. St. ¶¶37-38). At that meeting Foster described her medical issues to DeHesus and said she believed she was getting sicker as a result of Walton's treatment of her (F. Resp. ¶40).

In April, at Northwestern's request, Foster was evaluated by Dr. Aaron Reichlin ("Dr. Reichlin") to determine her ability to return to work after she returned from FMLA leave (F. Mem. Ex. 3 43:1-46:20). Dr. Reichlin's report stated that he believed Foster would be able to return to work shortly and that the viability of an interdepartmental transfer should be considered (id.). DeHesus did not consider such a transfer because she was focused only on determining whether Foster could return to work within a short time (id.).

On May 9 Foster filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), charging that she had been the victim of discrimination on the basis of disability (N. St. ¶42). Then in mid-May Foster left work and did not give Northwestern any indication as to when she would return (N. St. ¶46).

Soon after Foster left, DeHesus ran a report that she believed indicated that Foster would run out of FMLA leave on June 4 (id. ¶47). On May 17 Northwestern's Assistant General Counsel Julia Lynch ("Lynch") spoke to Foster by phone to inquire

about her status (id. ¶48).  After Foster told Lynch that she was
not able to return to work in any capacity, Lynch encouraged her
to apply for a personal leave of absence if she was unable to
return to work after her FMLA leave expired in June (id. ¶¶48-
49).

On June 4 Foster did submit a request for a 12-week leave of
absence along with a note from a doctor stating she was unable to
work in any capacity due to her medical condition (id. ¶54).
Lynch and DeHesus then authorized Foster's request for a personal
leave of absence (id. ¶55).

At the end of June Foster got back in touch with Lynch and
told her that she was feeling better and was interested in
returning to work (N. St. ¶61).  In July Foster informed DeHesus
that she wanted her job back because she had been cleared to
resume work (F. Resp. ¶58).  But Lynch responded for Northwestern
by telling Foster that because of billing department needs
someone had been hired to perform her job duties but that she
should apply for different positions at Northwestern (N. St.
¶62).

In fact, on June 4 Julita Velasco ("Velasco") had been hired
as a billing coordinator in the Hematology/Oncology division
(after having filled out an application form, Velasco had been
interviewed earlier--on February 8)(F. Mem. Ex. 8 6-7).  It was
not until October 8, however, that Foster's actual position

number was filled by Arturo Quipse (he had also filled out an earlier application form and had been interviewed on January 24) (id.).

Foster applied for approximately 25 positions at Northwestern from July to November, including every billing coordinator position posted on Northwestern's website (F. Resp. ¶64). In August Foster interviewed for a billing coordinator position in a division other than Hematology/Oncology (F. Mem. Ex. 1 267:12-271:7). Post-interview the interviewer called Walton, and the interviewer then told Foster that after her conversation with Walton she could not offer Foster the position (id.).

After Foster's personal leave ended, she was terminated effective on September 7 (N. St. ¶65). On February 24, 2008 Foster filed a second EEOC Charge of Discrimination, this time charging both disability-based discrimination and retaliation for having engaged in protected activity (N. St. ¶43).

## FMLA Interference

To succeed on an FMLA interference claim, Foster must demonstrate that Northwestern deprived her of an FMLA entitlement (Burnett v. LFW, Inc., 472 F.3d 471, 477 (7th Cir. 2006)). Foster has not clearly articulated precisely what entitlement Northwestern has infringed (F. Mem. 7-8). Instead she provides a litany of actions, taken primarily by Walton, that she argues

8

discouraged her from taking her leave (id.).

But such discouraging actions are not relevant when the only question is whether the employee has been granted her substantive entitlements (Diaz v. Fort Wayne Foundry Corp., 131 F.3d 711, 712-13 (7th Cir. 1997)). Here Foster does not dispute that she received the 12 weeks of leave to which she was entitled under FMLA. Northwestern also did not commit any violation of Foster's substantive FMLA rights when it did not bring her back at the end of her leave period, for she was not able to perform the functions of her job at that time (Franzen v. Ellis Corp., 543 F.3d 420, 426 (7th Cir. 2008)). For these reasons Foster cannot succeed on a theory of FMLA interference, and that component of her lawsuit succumbs under Rule 56.

## FMLA Retaliation[5]

Employers may not retaliate against employees for exercising their substantive FMLA rights (Breneisen v. Motorola, Inc., 512 F.3d 972, 978 (7th Cir. 2008)). Foster proceeds on a direct

---

[5] Northwestern has raised, and both parties have briefed, the issue of limitations as to the FMLA retaliation claim. While that issue is generally thought of as a threshold matter, it rests on determining whether there was possible willfulness involved in any violation (N. Mem. 3-5; F. Mem. 4-7). Because the willfulness question requires a showing of some underlying substantive violation, this section of the opinion turns directly to the analysis of the substantive issues. And because the ensuing discussion finds Foster does not succeed in that effort, there will be no need for this opinion to address the statute of limitations issue.

theory of retaliation, for which purpose she must adduce evidence (1) that she engaged in statutorily protected activity, (2) that she suffered an adverse employment action and (3) that a causal connection existed between the activity and the action (Cracco v. Vitran Express, Inc., 559 F.3d 625, 633 (7th Cir. 2009)). Northwestern concedes that by taking FMLA leave Foster engaged in statutorily protected activity, but it contests the other two elements (N. R. Mem. 4-6).

To satisfy the second element, an employer's actions must be materially adverse to the employee, not merely trivial harms (Cole v. Illinois, 562 F.3d 812, 816 (7th Cir. 2009)).  Foster argues that such a materially adverse action was taken against her when she asked for her position back in July 2007 and was told that someone had been hired to perform her job duties (F. Mem. 6-7).  Northwestern does not dispute that interfering with the ability to regain one's position would be an adverse employment action--it argues instead that there was no billing coordinator position available in fact in July 2007 (N. R. Mem. 5).

All of the relevant facts submitted by the parties on that subject have been included in the factual background section of this opinion.  Unfortunately the parties have left significant gaps in their narratives.

What is known is that Northwestern began accepting

applications and interviewing for billing coordinators in the Hematology/Oncology division early in 2007 (F. Mem. Ex. 8 6-7). Then on June 4, soon after Foster left work and in the same time frame as the expiration of Foster's FMLA leave, Northwestern hired an individual who had been interviewed earlier that year as a billing coordinator in the Hematology/Oncology division (id.). According to Northwestern, the hiree then performed Foster's job duties but was not hired into her specific position number (N. St. ¶62). Then in October, well after Foster had been told that her old job duties had been filled, another individual who had interviewed for a billing coordinator position in early 2007 was hired into Foster's specific position number (F. Mem. Ex. 8 6-7).

Without additional factual details, this Court can only guess at the status of Foster's position in July 2007. Each side puts a different spin on the above-stated sequence of events.

Foster contends that the fact that two individuals were interviewed early in 2007 and then hired later that year indicates either that Northwestern planned to replace Foster even before knowing whether she would return from her FMLA leave or, at least, that there was a relevant opening in July 2007 and Northwestern was less than forthcoming about that fact (F. Mem. 15). Either of those scenarios would have maneuvered Foster out of being rehired into a position like that she held before her use of FMLA leave.

For its part, Northwestern accuses Foster of speculation and lamely suggests that it had no knowledge that Foster would take extended FMLA leave (N. R. Mem. 12). But of course Foster had already taken significant leave (as well as having several run-ins with her supervisors). More importantly, Northwestern's protests do not effectively address the situation as of the most critical time: July 2007.

That evidentiary gap clearly cuts against Northwestern, for it will be remembered that under Rule 56 all reasonable inferences must be drawn in Foster's favor. In those terms Foster has adequately demonstrated that she was subjected to an adverse action.

But even the most favorable reasonable inferences do not provide the necessary causal nexus between Foster's use of FMLA leave and the adverse action she suffered. To the extent that Foster relies on the temporal proximity between taking her leave and July 2007, our Court of Appeals teaches that reliance on such temporal proximity alone will not suffice (Kampmier v. Emeritus Corp., 472 F.3d 930, 939 (7th Cir. 2007)). And here Foster has proffered nothing substantive to add to the mere factor of timing. Accordingly Northwestern's motion for summary judgment on Foster's FMLA retaliation count is granted.

## ADA Discrimination

Foster attempts to employ the so-called direct approach to

demonstrate discrimination in violation of ADA (F. Mem. 9-10).
Under that approach plaintiffs either must adduce direct evidence
of the employer's discriminatory intent or, lacking that, must
create a "convincing mosaic of discrimination against the
plaintiff" out of pieces of circumstantial evidence (Troupe v.
May Dep't Stores Co., 20 F.3d 734, 737 (7th Cir. 2004)).

Because there is no direct evidence of Northwestern's
discriminatory animus, Foster looks to circumstantial evidence[6]
to imply discrimination. To that end Foster points to the
already discussed fact that Northwestern was at least not
entirely forthcoming (if not indeed deceptive) when Foster asked
for her old job back in July 2007. Importantly, Foster also
points out that both Walton and DeHesus, and presumably others
involved in conversations about bringing her back in July 2007,
were aware of her medical condition. Finally, Foster also relies
on a number of situations when she believed Walton mistreated her
because of disability, such as when Walton asked her about her
medication, created a journal about her workplace habits,
proposed that she be fired for trivial mistakes and interfered
with her ability to land a job she interviewed for in the fall of

---

[6] Such circumstantial evidence may include for example
suspicious timing, ambiguously discriminatory statements,
preferential behavior toward other employees, evidence that
similarly situated non-protected employees were treated more
favorably or evidence of pretext (Troupe, 20 F.3d at 737).

2007.[7]

For the reasons discussed earlier in this opinion, the response Foster received from Northwestern in July 2007 was a materially adverse action. Significantly, the background information here demonstrates that many of the individuals who interacted with Foster in July 2007 and who were most likely involved in the hiring of billing coordinators in Hematology/Oncology division were well aware of Foster's disability.

To be sure, there may perhaps be possible legitimate explanations for Northwestern's not having given Foster full and accurate information in July 2007. But given the relevant background and what can reasonably be viewed as the hostile nature of Walton's behavior, a factfinder could readily infer that Northwestern had decided it did not want to deal with Foster's disability and therefore did its best to hide the relevant position. Hence summary judgment is denied as to Foster's ADA discrimination claim.

---

[7] Additional circumstantial evidence that Foster points to on that score appears insubstantial (F. Mem. 10). In particular, Foster's suggestion that the documentation of an oral warning was forged after the fact is unsubstantiated. While there may be certain substantive and procedural inconsistencies in the relevant document, the document is broadly consistent with other warnings that Foster later received, and the fact that it was not signed or stamped appropriately appears more likely to be the indication an oversight rather than a forgery.

## ADA Retaliation

To show actionable retaliation under ADA, Foster must establish the same three elements as with her FMLA retaliation count (Turner v. The Saloon, Ltd., 595 F.3d 679, 690 (7th Cir. 2010)). As to the first two elements, Foster's filing of an EEOC charge in May 2007 constitutes the relevant protected activity, and once again Northwestern's reaction to Foster's request to return to work in July 2007 constitutes the needed adverse employment action.

But here too Foster falls at the third hurdle: She fails to demonstrate the requisite causal connection, this time between her May 2007 filing of an EEOC charge and Northwestern's response to her in July 2007 (F. Mem. 14-15). As discussed earlier, reliance on mere temporal proximity between those two dates without any additional substantive evidence will not suffice to establish a causal connection.

Indeed, Northwestern points out that in that time period between May and July 2007 it granted Foster 12 weeks of personal leave (N. Mem 13). That is hardly consonant with any alleged retaliatory mindset. But in all events that matter hinges on Foster's showing of the requisite causal connection, and there is no evidence of that. Foster's ADA retaliation theory fails.

## ADA Failure To Accommodate

To succeed on an ADA failure-to-accommodate theory, Foster

must show that (1) she is a qualified individual with a
disability, (2) Northwestern knew of that disability and (3)
Northwestern failed to provide a reasonable accommodation of the
disability (<u>Kotwica v. Rose Packing Co.</u>, 637 F.3d 744, 747-48
(7th Cir. 2011)). Foster contends that she repeatedly asked
Northwestern to accommodate her disability by resolving her
issues with Walton through more active management or by
transferring Foster to a different division (F. Mem. 11-12).
Northwestern responds that Foster's requests for accommodation
were not reasonably related to her disability and that a request
for a new supervisor does not seek a reasonable accommodation (N.
Mem. 12-13).[8]

Northwestern's first contention--that Foster's request for
accommodation was not related to her disability--is unconvincing.
It advances that notion in attempted reliance on an out-of-
circuit case that held an inability to procreate is not related
to the performance of demanding physical labor as a ready-mix
concrete truck driver (<u>Wood v. Crown Redi-Mix, Inc.</u>, 339 F.3d
682, 686-87 (8th Cir. 2003)). Any such analogy is an
impermissible stretch--here it is certainly possible for a jury

---

[8] After initially arguing that Foster failed to include her
failure-to-accommodate claim in her EEOC charge (N. Mem. 11-12),
Northwestern did not pursue that line of argument in its reply
memorandum, very possibly because of Foster's reminder that it
had not pleaded such an affirmative defense as required by Rule
8(c)(F. Mem. 10-11).

to find that Foster's anxiety issues were exacerbated by her contentious relationship with Walton.

Northwestern does better in providing support for its argument that a request to work for a different supervisor does not qualify as asking for a reasonable accommodation (N. Mem. 13; N. R. Mem. 9-10). Gile v. United Airlines, Inc., 95 F.3d 492, 499 (7th Cir. 1996)(citation omitted) has made it plain that an employer is not obligated to transfer a disabled employee when a vacant position is not available:

> An employer may be obligated to reassign a disabled employee, but only to vacant positions; an employer is not required to "bump" other employees to create a vacancy so as to be able to reassign the disabled employee. Nor is an employer obligated to create a "new" position for the disabled employee.

Foster has provided no showing of the existence of any such vacant position elsewhere at the time of her repeated requests for transfer.

That, however, does not let Northwestern off the hook. Instead, once Foster disclosed both her disability and her desire for an accommodation, Northwestern incurred an obligation to engage with her in an "interactive process to determine the appropriate accommodation under the circumstances" EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 805 (7th Cir. 2005)(quotation marks omitted). On that score Northwestern argues that its conduct did not result in the breakdown of the interactive process because none of Foster's requests "constitute an appropriate reasonable

accommodation" (N. R. Mem. 11).

But while it may ultimately turn out that there were in fact no comparable vacant positions at the time of Foster's various requests, the statute requires Northwestern to do more than suggest such a fact ex post.  Instead the interactive process "imposes a duty on employers to engage in a flexible give-and-take with the disabled employee so that together they can determine what accommodation would enable the employee to continue working" (Sears, 417 F.3d at 805).  While there is no hard and fast rule on what is required by either side in the interactive process, "the employer may not simply reject [the request] without offering other suggestions or at least expressing a willingness to continue discussing possible accommodations" (id. at 806).

Northwestern provides no evidence that it engaged in any such process.[9]  Rather the only evidence that has been presented

---

[9] Northwestern's citation to Weiler v. Household Fin. Corp., 101 F.3d 519, 526 (7th Cir. 1996) is unavailing.  Northwestern's behavior can be distinguished from the actions of the defendants in Weiler on the same basis that our Court of Appeals distinguished the behavior of the defendant in Gile v. United Ailrines, Inc., 213 F.3d 365, 737 (7th Cir. 2000) from that of the Weiler defendant:

Unlike [Weiler], where the plaintiff requested a transfer which would have required either creation of a new position or bumping another employee, and the defendant contacted the plaintiff about five available positions as alternative accommodation, United made no effort to accommodate Gile.

18

suggests that each time Foster requested a transfer her suggestion was rejected, and Northwestern did nothing to engage in any kind of process to determine if other possible accommodations were available. In sum, Foster will be allowed to proceed with her failure-to-accommodate claim.

## Conclusion

With no genuine issue of material fact having been identified on certain of Foster's claims--her FMLA claims and her ADA retaliation claim--Northwestern is entitled to a judgment as a matter of law on those claims, which are dismissed. Summary judgment is denied, however, on Foster's ADA discrimination and failure-to-accommodate claims. Finally, a status hearing is set for 8:45 a.m. July 6, 2011 to discuss the future course of this litigation on those surviving claims.

_____
Milton I. Shadur
Senior United States District Judge

Date: June 28, 2011